## MOLYNEAUX *vs.* COLLIER.

1. A witness is incompetent on the score of interest, either where he will be gainer or loser by the event of the suit, or where the record can be used in his favor in another case, to which he is a party.

2. A witness testifying *ore tenus*, may be contradicted and thus discredited, by his depositions previously taken in the same case, or in a different case involving the same issues.

3. A bond of indemnity to protect a witness against all liability, will not restore him to competency where he is disqualified on the ground of interest.

4. Every contract must be founded upon a consideration, either good or valuable, otherwise it is a *nude pact*. If a plaintiff in *fi. fa.* has a lien upon property which is sold for $8,000 00, or is worth that amount, and he agrees to accept of $2,000 00, or one-fourth of the amount, from the defendant in execution or the purchaser under him, and release the debtor from his liability upon the judgment debt, the agreement is gratuitous and cannot be enforced.

5. Where a defendant in *fi. fa.* has deliberately, and repeatedly, verbally and in writing, recognized the debt as good and subsisting, and promised to pay it, it is error in the Court to assume that these admissions and declarations were made by the defendant in ignorance of his rights, for the purpose of reconciling his conduct with the contract which he now seeks to set up in his discharge ; on the contrary, they rather tend to prove that no such contract was ever entered into, or at least, that the defendant did not understand it as releasing him from liability.

6. A Court of Equity will not only relieve against a contract founded in fraud, that is, a suppression of the truth or a suggestion of falsehood, but also where both parties honestly labor under a mistake or misapprehension of the facts.

7. Where a creditor agrees to accept from an insolvent debtor, a less sum for a greater, to be paid in personal service, (instead of property) or the debt of a third person, is a valid contract ; *aliter*, if the debtor was solvent.

8. A complainant coming into equity, seeking to be discharged from the payment of a just debt, must make it appear that his claim is not against honor and conscience.

In Equity, from Dougherty county.　Decided by Judge ALLEN, at June Term, 1859.

This was a bill filed by George W. Collier, and has heretofore been before this Court, as stated in 17th *Georgia Reports*, page 46.　The material allegations of the bill are about as follows :

Collier, Bracewell and St. George, entered into a copartnership in 1838 for the purpose of merchandizing at Hawkinsville, under the name of Collier & Bracewell. Edward Molyneaux recovered judgment against Collier & Bracewell, with St. George as security on the appeal, for $9,360 00, with interest and costs. The firm was insolvent, and the partners, individually liable, were in doubtful, if not insolvent, circumstances. John Rawls, with a full knowledge of these facts, purchased this *fi. fa.* from Molyneaux, and held it against the partners. He was President of the Bank of Hawkinsville, and a large stockholder therein, and as such controlled large *fi. fas.* and mortgages against St. George. Bracewell had possession of some property, but there was a cloud over his title—it being claimed by his son-in-law. Collier, the complainant, was insolvent.

Under these circumstances, and in view of these facts, Rawls proposed to Collier, Bracewell, and St. George, that if each one of them would, from his personal efforts and yearly labor, pay to him one-third of the amount of said *fi. fa.*, he would release and discharge the one so complying with this offer from all further liability thereon. Collier and St. George, each, complied with this proposition. Bracewell failed to comply, and in 1840 removed beyond the limits of the State, carrying with him the property, negroes, and stock in his possession. Rawls permitting him so to remove without attempting to stop him or to levy on and try the title to said property, against and in spite of the remonstrances of Collier and his earnest appeal to levy thereon. Rawls died, and his widow and C. Taylor, became administrators on said estate. With the view to defraud Collier and St. George, the administrators procured Molyneaux to transfer the said *fi. fa.* to the Merchants' Bank of Macon, in whose name it was proceeding at the time of the filing of the bill, having been levied on the property of Collier for the payment of the remaining third due thereon.

In the bill, as originally filed, it was alleged that Bracewell carried away property amply sufficient to pay said *fi. fa.*, and that Rawls permitted him to remove. In an amendment this allegation was modified as previously stated. The amendment also alleged that St. George, although possessed of a considerable estate, was, nevertheless, largely involved, and that Rawls had a large claim against him ; and if all his

Mollyneaux *vs.* Collier.

debts were pressed against him, he would have proved to be insolvent.

Exhibits of the mortgages and debts due by St. George, were not attached to said bill. The amendment alleged various payments by St. George, and also claimed a credit from the sale of a negro, the property of Collier, and prayed discovery as to the payment on said *fi. fa.* The prayer was for injunction and general relief.

The bill was subsequently amended, and charges that in 1842, John Rawls, in consideration that complainant was in insolvent circumstances, agreed with Jonathan Davis and complainant that if they would secure the payment of one-third of said *fi. fa.*, by giving him a negotiable note on one Harrison Jones who was then negotiating with Davis for some negroes originally owned by complainant—the note to be for two thousand dollars, and the balance agreed on to be paid by Davis—he, Rawls, would release complainant from all further liability on said *fi. fa.*

The defendants filed their answers which do not admit any of the material allegations of the bill.

On the trial of the case the following evidence was introduced by complainant:

Joseph Caruthers testified: That he was Sheriff or Deputy Sheriff of Pulaski county, in the years 1840–1–2–3–4; and frequently during those years held *fi. fas.* against St. George; does not remember ever to have made any other return on them than satisfaction. St. George, in 1842, had about forty negroes and about twenty-three hundred acres of land. The country was then suffering under a great financial crisis, and if St. George's negroes had been forced to sale, thinks they would not have averaged more than $300 00 each, and his lands would have brought in specie funds about five dollars an acre. St. George was largely indebted to James Everitt and others, and if his property had been sold at that time for specie funds at sheriff's sale, does not think the same would have paid his debts. Nothing could have been made out of Collier and Bracewell in the Spring of 1842; does not remember in what year Bracewell left Pulaski county; witness, as sheriff, used to make money out of him when required, as long as he staid there, and never should have made an entry of *nulla bona.* St. George left at his death some thirty-five or forty thousand dollars worth

of property, most of which was inherited by the Colliers, complainant included. St. George's property, if sold in 1842 for other than specie funds, would have brought a good deal more than $25,000 00. His credit was then good and witness considered him responsible.

Complainant next put in evidence exemplifications of executions and mortgages against St. George, as follows:

A *fi. fa.* issued on a judgment obtained in July, 1840, in favor of the Bank of Hawkinsville for the principal sum of $16,025 25, upon which were various credits from April 5, 1842, to November 8, 1850, showing satisfaction in full. A mortgage to the Bank of Hawkinsville, dated February 18, 1841, to secure three notes due on the first days of January, 1842–3–4 respectively, and being for the aggregate amount of about $6,730 00, the mortgage covering all of St. George's land and negroes. A *fi. fa.* in favor of Molyneaux against Collier and Bracewell, and St. George security on appeal issued on a judgment obtained in July, 1840, for principal $9,306 10. A *fi. fa.* in favor of Washburn and Lewis against the firm of Collier, Jelks & Co., composed of Bryan W. Collier, J. O. Jelks, and Edward St. George, issued on a judgment obtained in July, 1840, for principal sum of $349 51. A *fi. fa.* against said last named parties, and issued on a judgment obtained at the same time for the principal sum of 13 dollars and 25 cents. A *fi. fa.* in favor of Miles Fields against said firm of Collier, Jelks & Co., on a judgment obtained in January, 1841, for principal sum of $116 28. A *fi. fa.* in favor of Silas Bronson against Collier, Bracewell, and St. George, on a judgment obtained in July, 1841, for principal sum of $579 26. A *fi. fa.* against the firm of Collier, Bracewell & Co., and St. George, security, on appeal on a judgment obtained in July, 1841, for principal sum of $324 81. A *fi. fa.* against Bracewell as principal, and St. George as security on a judgment obtained in July, 1841, for principal sum of $558 54. A *fi. fa.* against Collier, Bracewell & Co., and St. George as security on a judgment obtained in July, 1841, for principal sum of $514 82. A *fi. fa.* against Collier, Bracewell & Co., and St. George security on a judgment obtained in July, 1841, for the principal sum of $1,855 36. A *fi. fa.* against Collier and Bracewell, and St. George as security, on a judgment obtained in July, 1841, for the principal sum of

$404 95. A *fi. fa.* against Collier, Bracewell and St. George, on a judgment obtained in July, 1841, for principal sum of $673 67. A *fi. fa.* against Collier, Jelks and St. George, on a judgment obtained in April, 1842, for principal sum of $1,043 00. A *fi. fa.* against Collier and Bracewell, and St. George as security, on a judgment obtained in April, 1842, for principal sum of $412 91. A *fi. fa.* against Jelks, Bracewell and St. George, on a judgment obtained in October, 1841, for principal sum of $416 00.

The transcript from the execution docket of Pulaski county showed, that the above named *fi. fas.* for the principal sums of $340 51, $116 28, $324 80, were satisfied in full in April, 1842; and the *fi. fas.* for the principal sums of $412 91, $1,324 35, were satisfied in full in January and March, 1844.

Complainant also put in evidence the record of *fi. fas.* against Bracewell and George W. Collier, amounting to several thousand dollars issued on judgments obtained in 1841, 1842, 1843, etc.

Thomas Collier testified : That he understood from John Rawls, that he controlled the *fi. fa.* in favor of Molyneaux against Collier, Bracewell and St. George, during the years 1842. Witness and Jonathan Davis were in Hawkinsville during the Fall Term, 1841, of Pulaski Superior Court, or the Spring Term thereafter, at which time a conversation occurred between said Davis and said John Rawls, in which Davis stated to Rawls that he was there to have George W. Collier released from the Molyneaux *fi. fa.,* and pointed out to said Rawls certain negroes of Bracewell. John Rawls said to Davis that, by virtue of a contract between him, Davis, and George W. Collier, said Collier was to be or had been released by his paying one-third of said *fi. fa.* Witness heard Rawls say the same thing at Albany, prior to the conversation referred to. George W. Collier was worth but little at the time referred to ; does not know whether he was considered solvent or not. The firm of Collier, Bracewell and St. George, was solvent, if the individual property of each partner were to be taken into consideration.

The same witness also testified, in answer to a second set of interrogatories, that he was present when John Rawls, George W. Collier, Jonathan Davis, Harrison Jones, James B. Mayo, and Green Tinsley, were together in Albany; a credit of $2,000 00 was then paid on the Molyneaux *fi. fa.,*

in a note made by said Jones as a final settlement of George W. Collier's part of said *fi. fa.* Rawls then agreed to release said Collier, and saying he would take the *fi. fa.* to Pulaski county and make the balance of it out of the other parties. This was prior to the conversation testified to in Hawkinsville. The payment that was made in Albany was on the occasion of the purchase by Harrison Jones from Jonathan Davis of certain negroes which Davis had bought of Collier, it being admitted that the negroes were liable to the Mollyneaux *fi. fa.*

Complainant then offered Jonathan Davis as a witness. Defendants objected on the ground that he was interested in the result of the suit, and in support of their objection, showed the Court that said Davis had filed a bill to enjoin the collection of the Molyneaux *fi. fa.* out of certain lands and negroes, upon which it had been levied, and which land and negroes said Davis had bought of Collier, the complainant. It was also shown that Davis had claimed the land levied on, and that the claim case was still pending; also, that Davis had given an injunction bond on filing said bill conditioned for the payment to said Molyneaux of the eventual condemnation money and costs, in the event said injunction and bill were not sustained. And further, the order of the Court dismissing said bill was produced and shown.

The Court overruled the objection made as to the competency of Davis, •it appearing that complainant had given bond with security to save Davis harmless from the effect of any decree that may be rendered in this suit, and to protect him against the lien of said *fi. fa.*, and complainant offering to deposit the costs in the Clerk's office accruing in said claim case.

Complainant also offered to give a bond to cover all damages and costs that might be recovered against Davis in the claim case, which proposition was not accepted by defendants, and no such bond was given by complainant or required by the Court.

Jonathan Davis was then put on the stand, and testified relative to many material points in the case.

Peter E. Love testified, that Bracewell had possession of property in 1842, consisting of two slaves and a small plantation, which he claimed as his own; thinks the two negroes

Molyneaux *vs.* Collier.

were worth $1,200. Bracewell had other negroes in his possession at that time, which he claimed as the property of his son, worth about $4,000 00. He carried all these negroes, except one, off with him when he removed from Pulaski county.

E. J. Stow testified relative to the ownership of the stock of the Bank of Hawkinsville. His testimony shows that John Rawls in 1842 owned 442 shares in that bank.

The Molyneaux *fi. fas.*, with the entries thereon, was then put in evidence.

Lott Warren testified, that in 1841 or '42, after complainant conveyed his property to Jonathan Davis, he, complainant, was considered insolvent. Complainant here closed.

## Defendants introduced the following evidence:

Joseph Caruthers testified, that St. George died in 1850, or 1851, and left an estate worth $45,000 00, one-fourth of which was inherited by complainant. St. George was solvent in 1841–2–3. He owned forty or fifty negroes and at least two thousand acres of land at that time. Witness was intimate with St. George; his condition in 1844 was about the same as in 1842; does not know the exact amount of his indebtedness during those years, but does not suppose he owed at any time more than $25,000 00. Thinks if his property had been sold at that time, it would have paid his debts. James Everett held the largest claim against him. Does not know the amount for which St. George was sued, but the amount was large.

John J. Anderson testified, that he was intimately acquainted with St. George eight or ten years prior to his death; was acquainted, to some extent, with his pecuniary affairs in 1842 and '43, and thinks he owned about forty negroes and between sixteen hundred and two thousand acres of land; considered him solvent at that time, but greatly embarrassed. Heard him frequently say, if his creditors pushed him they would break him up. He left an estate worth about $40,000 at the time of his death. Witness thinks he heard St. George say in his lifetime, that he would have to pay for the two firms of Collier & Jelks and Collier & Bracewell, thirty or forty thousand dollars. James Everett held the largest claims against him. Witness thinks if his creditors had pushed him they would have broke him.

Daniel Matthews testified, that he got the Molyneaux *fi. fa.* from complainant in September, 1843, and delivered it to John Rawls. Complainant was then acting as Deputy Sheriff. In a conversation which occurred at the time, complainant stated that he did not think Rawls would sell his property, but would give him time to raise the money. Rawls held another claim against complainant, he thinks it was a *fi. fa.* The conversation had reference to all the claims that Rawls held or controlled against complainant.

Daniel Mathews was re-examined and testified, that in 1843, he called on complainant to get the Molyneaux *fi. fa.* and a *fi. fa.* in favor of one Wilcox against Collier & Bracewell. Witness got those *fi. fas.* for Rawls, who wished to raise money on them from Bracewell's property. In a conversation at the time with complainant, he said that Mr. Rawls would at least give further time to pay the *fi. fas.*, if he failed to make the Sheriff of Pulaski responsible for the negroes Bracewell run off to Florida.

A. H. Hansell testified that he had a conversation with complainant, in which he stated that he was desirous of settling the Molyneaux *fi. fa.* by turning over lands which he said were worth the amount of the debt, and wished witness to get an order passed authorizing the administrator of Rawls to take the lands in settlement. Witness was acquainted with the condition of Bracewell and St. George in 1842. Bracewell was insolvent; St. George was a good deal involved, but owned property to the amount of thirty or thirty-five thousand dollars, besides a life interest in about thirty negroes. Witness thinks the oldest lien against him was the Molyneaux *fi. fa.*, and states that there would have been no difficulty of collecting the *fi. fa.* out of St. George. At the time of the conversation with complainant, witness was the attorney for the estate of Rawls. He states that the Bank of Hawkinsville held mortgages on St. George's property, the exact amount of which he does not know, but thinks fifteen to eighteen thousand dollars. It was understood that St. George was to work his negroes and land, and pay every year as he could; and witness thinks he did reduce his indebtedness very rapidly.

The testimony of Edward St. George, taken in September, 1848, was then read. He states that some ten years prior to that time, complainant owned a plantation and some

Molyneaux *vs.* Collier.

twenty-five or thirty negroes ; and witness thinks he can state with safety since he has known him, that Bracewell owned ten or twelve negroes and a part of a plantation in 1841 and '42. Witness had a conversation with Jonathan Davis in 1843 or 1844, in which Davis told him that if he failed to arrange the Molyneaux *fi. fa.*, that witness was safe because the *fi. fa.* was older than the title which he, Davis, had from Collier to the lands in Baker county. In no conversation which he ever had with Collier and Davis, did either of them pretend that Collier was discharged from liability on said *fi. fa.*, but Collier always spoke of being liable to pay the whole of it.

Green Tinsley testified, that he was present at Albany at the time Jonathan Davis sold to Harrison Jones some negroes previously bought by Davis from complainant. The transaction took place early in the year 1842 ; does not think Thomas Collier was present, but Jonathan Davis, Harrison Jones, John Rawls, and James J. Mayo, were present. There was this difficulty in the way of the purchase of the negroes by Jones : Rawls had placed in the hands of witness as sheriff, the Molyneaux *fi. fa.;* Jones refused to buy the negroes, unless Rawls would release them from the lien of said *fi. fa.;* Davis or Jones, or perhaps both of them, agreed to give a note for $2,000 00, to be paid thereafter, provided Rawls would release the negroes from said lien, so that Jones could get a good title. This Rawls agreed to do, and the note was executed. Rawls did not agree to release complainant from liability on the *fi. fa.;* the agreement related only to the release of the particular negroes bought by Jones from Davis. In 1842, complainant had property consisting of land and negroes, but cannot state the quantity or value. Complainant was also present at the time referred to, and assented to, or did not dissent from, the agreement that was made.

A letter from Jonathan Davis to Rawls was then read, dated February 22, 1842, in which he excuses himself for not having called on Rawls at Hawkinsville, speaks of the hard time and asks Rawls' indulgence and refers to the Bracewell land having been advertised for sale, and asks Rawls to run it up and have the money applied to the Molyneaux *fi. fa.*

A letter from complainant to Rawls was then read, dated

22d February, 1843, in which he promises to pay $600 00 as soon as the river got high enough to allow cotton to be shipped, and says he expected to pay about one-half of his debts that winter, and hoped Rawls would give him indulgence for the balance. He refers to the levy made on the Bracewell land, and expresses the hope that Rawls will run up the land and protect him as far as he could.

A bill of sale from complainant to Jonathan Davis, dated February 23d, 1841, was then read in evidence, conveying, for the sum of $8,360 00, twenty negroes, besides horses, mules, cattle, etc.

A deed from complainant to Davis, dated February 23d, 1841, was put in evidence, conveying a number of lots of land in Baker county for the alleged consideration of $11,375 00.

The bill filed by Jonathan Davis, enjoining Molyneaux *fi. fa.,* already referred to, was then read to the jury.

The defendant then proposed to read the depositions of Jonathan Davis, taken by commission, for the purpose of impeaching his statements made on the stand. Objection being made, the Court ruled out all of said depositions, except those parts which had been read over to Davis and to which his attention had been called whilst he was on the stand.

Samuel T. Bailey testified, that he had a conversation with Jonathan Davis prior to Rawls' death, and he thinks it was in 1843, in which Davis said he had come to Hawkinsville to make an arrangement about Collier's debt, and wanted to employ witness as attorney at law for Collier, to protect the property he, Davis, had bought from Collier from the Molyneaux *fi. fa.,* said property being subject to that *fi. fa.* The ground on which he desired witness to resist the collection of said *fi. fa.* out of Collier, was that Collier was released because Rawls failed to have the *fi. fa.* levied on Bracewell's property when Davis had pointed out the same; Rawls then agreeing to make such a levy. Davis said nothing whatever about Rawls having agreed to release Collier. Witness afterwards named to Collier what he would charge him; Collier declined to give the price, and there the matter ended. Witness was never employed in the case neither by Collier or Davis.

James J. Mayo was then sworn by complainant in rebuttal, and testified that on the day Rawls released the negroes

bought by Jones from Davis, Rawls asked witness if the property of complainant not included in the release was sufficient to pay off the Molyneaux *fi. fa.* Witness asked Rawls if that was the oldest *fi. fa.* against Collier. Rawls replied tnat it was, and witness then told him there was a plenty of property left. The release of said negroes made by Rawls to Jones was in writing. Negotiations between the parties were going on all day—the difficulty being how much of the proceeds of said sale Rawls should get on his *fi. fa.* It was finally agreed that $2,000 00 of the sale should be paid over to Rawls, as well as witness remembers, the $2,000 00 was paid by Jones in a draft to Jonathan Davis on Savannah, which was received by Rawls and credited on the *fi. fa.* at that time. Rawls then agreed to collect $2,000 00 out of each of the other defendants, and to look to complainant only for what might then remain due, which it was estimated would be from three to five thousand dollars. The parties present at this transaction were: Rawls, Davis, Jones, G. W. Collier, Tinsley, witness and, he thinks, Thomas Collier.

The evidence in the case here closed, and the jury having returned a verdict for complainant, counsel for defendants moved for a new trial on the following grounds:

1st. Because the Court erred in admitting the transcript of the execution docket of Pulaski county, of certain *fi. fas.*, with copies of entries purporting to have been made by the sheriff—the Clerk having certified that the originals were not on file in his office.

2d. Because the Court erred in admitting in evidence the *fi. fa.* of John Rawls, for the use of the Bank of Hawkinsville *vs.* Collier & Bracewell, with the entry of " no property " thereon, it appearing from the record that Collier was not served or made a party to said suit, and was not a citizen of that county when the said entry was made.

3d. Because the Court erred in admitting the transcript of the execution docket from Baker county—the objection made being the same as that to the transcript from Pulaski.

4th. Because the Court erred in admitting the evidence of Thomas Collier, it being shown that he had a *fi. fa.* against complainant of a junior date to the Molyneaux *fi. fa.*, and therefore interested in defeating said last named *fi. fa.*

5th. Because the Court erred in allowing Jonathan Davis to testify.

6th. Because the Court erred in rejecting the depositions Jonathan Davis offered.

7th. Because the jury found against that part of the charge in which the Court told the jury that if Rawls never made any contract to release Collier, then complainant cannot recover. And, again, if the jury believe such a contract was made because Collier induced Rawls to believe that defendants to said *fi. fa.* were insolvent and not able to pay it in full, when, in fact, they were solvent, then said contract was void for fraud. And again, that, if the jury believe that Rawls agreed to get one-third of the debt out of Bracewell, another third out of St. George, and leave only one-third for Collier to pay, this would not relieve Collier from liability for the whole debt—such agreement not being binding for want of consideration, that is, if the jury shall further believe that there was no contract to release Collier, based upon the insolvency of the defendants to the *fi. fa.,* or that such contract was fraudulent.

8th. Because the Court erred in giving the following charges to the jury:

That the answers of defendants upon hearsay, or when they deny any knowledge respecting the allegations of the bill are not evidence to be overcome.

That the jury must reconcile all the evidence in the case, so as to let each witness speak the truth, if possible.

That the letters of Collier and Davis, and the statements of Collier to Hansell and others, are evidence only to prove or disprove the contract set up in the bill, and if the jury believe, after carefully looking into all the evidence, that the contract was made, then the complainant will be entitled to a verdict.

That if the jury believe from the evidence, that Rawls agreed with George W. Collier in consideration of the personal labors and services of said Collier to be applied in payment of the one-third part of said *fi. fa.,* the said Collier was to be discharged from all liability on said *fi. fa.,* and the said Collier, in consideration of said contract, did enter upon the performance of that contract, and performed the same by paying $1,000 00 in money and $2,000 00 in a note on Jones, and that said payment was made and accepted in full of Collier's liability, and in discharge of said contract, then the

contract was executed and complainant is entitled to a verdict.

That said original contract alleged for Collier to apply the proceeds of his yearly labor until he paid one-third of said *fi. fa.*, when he was to be discharged, was legal and binding upon Rawls, if the jury believe that under it Rawls took the legal possibility of a benefit from the embarrased condition of the parties, or the better to secure his younger mortgages and judgment.

That if the jury believe from the evidence, that a contract was made in Albany, in 1842, between Collier, Davis, and Rawls, by which Rawls took and accepted in full satisfaction of Collier's liability, $2,000 00 in Harrison Jones' note, with cotton to secure it, then the said *fi. fa.* is satisfied as to Collier.

That if Rawls received and accepted what was paid by Davis, in full of Collier's liability on the *fi. fa.*, then the same was a good contract and executed, and this is true whether the parties were insolvent or good and though a less sum was paid.

That declarations and statements made in ignorance of one's legal rights do not bind him, and when explained, become worthless; and if Collier wrote the letter and made the statement and admissions under the apprehension that the contract would not protect him, then if you believe the contract has been proven, the admissions are explained.

9th. Because the jury found against the charge of the Court, in substance, as follows:

The complainant must prove the allegations in his bill to the satisfaction of the jury.

That in order to determine what was the contract between the parties, the jury will look at the evidence as to what was agreed on when it was consummated; all previous offers, etc., are merged in the final contract. Again, that if the jury believe there was such a contract as stated in the bill, and it was beneficial to Collier and detrimental to Rawls, it is void for want of consideration; and further, that the verdict was against the charge of the Court respecting the credit to be given to the testimony of witnesses where there is a conflict in the evidence.

11th. Because the Court erred in refusing to charge the

following request of defendant's counsel: "In weighing the credit to which a witness is entitled, his connection with the parties, his interest in the suit, the length of time about which he testifies, his manner of testifying, his hesitation and equivocation, the circumstances of his testifying, and all the circumstances are to be taken into the consideration of the jury."

12th. Because the finding was against law, against equity, and against the weight of evidence.

The Court overruled the motion for a new trial on all the grounds taken, and counsel for defendant excepted.

SLAUGHTER & SCARBOROUGH, for plaintiffs in error.

CLARK and HAWKINS, *contra.*

*By the Court.*—LUMPKIN, J., delivering the opinion.

Several of the grounds taken in the bill of exceptions, were waived upon the argument, and, therefore, will not be noticed in the decision.

1. Was Jonathan Davis a competent witness? The Molyneaux execution was levied upon land and negroes as the property of George W. Collier, and claimed by Jonathan Davis. The claim to the negroes was finally withdrawn by him, but the claim to the land is still pending and undisposed of. A judgment in this case, setting aside the execution, upon the ground that it was satisfied, could be used by Jonathan Davis to defeat the execution upon the claim trial, and he would be left, of course, to hold the land in dispute, consequently he is directly interested. He would be gainer by the event of this suit. The record, in this case, could be used by him in the trial of the claim. By both of the tests, therefore, prescribed by the rules of evidence, he is excluded for incompetency by reason of his interest.

2. Does a bond of indemnity, to protect him from all liability of whatsoever kind, restore him to competency?

It must be conceded there is a conflict of authority upon this point, but the weight of authority as well as the better opinion is against the restoration to competency by this mode of procedure. Who does not know and understand that it

is better to extinguish former or present liability rather than incur it and look to the bond of anybody for indemnity? Especially in this ever changing world, who can calculate with certainty upon the future for re-imbursement? The homely old adage, that a bird in the hand, etc., applies.

Our conclusion, then, is, that it was error to allow Mr. Davis to testify in this case.

3. The witness, Jonathan Davis, had been previously examined by commission upon interrogatories. Counsel proposed to contradict his present statements by his written depositions. The Court allowed this to be done, so far as the attention of the witness had been called to his answers in the interrogatories, but no further. In this, we think there was error: 7 *Ga. Rep.*, 467; 14 *ib.*, 85, 185. It was a kindness or favor to the witness to call his attention to any portion of his previous examination, and he cannot complain that his attention was turned to a part only.

4. The Court, amongst other things, charged the jury that the letters of Collier and Davis, and the statements and declarations of Collier to Hansell and others, were evidence only to prove or disprove the contract set up in the bill, and if the jury believed, after carefully looking to all the testimony, that the contract was made, then the complainants were entitled to a verdict. That if the jury believed that John Rawls made with Collier the contract set up in the bill, and that the same had been performed by the payment of $1,000 00 in cash by Collier, and $2,000 00 in Jones' note, and that said payment was accepted in full satisfaction and discharge of Collier's undertaking, the contract was executed and the jury must so find. And further, that if the jury should find that the contract set up was made in Albany, in 1842, and that Rawls accepted $2,000 00 in Jones' note, secured by Collier in full of the execution, in that event the *fi. fa.* was satisfied, and that, notwithstanding a less sum was received, and whether the defendants in the *fi. fa.* were solvent or insolvent. That if Collier wrote the letter to Hansell and made the admissions which he did, under the apprehension that the contract would not protect him, the admissions are explained, provided the contract was proven.

This case has been three times already before this Court: 3 *Kelly*, 112; 8 *T. R. Cobb's Rep.*, 406; and 17 *Ga. Rep.*, 46, and from first to last, from the beginning to the end,

the contract between Collier and Rawls has been sustained upon the assumption of the insolvency of the execution debtors. It could have been enforced upon no other ground. Without this element, it was a void contract, having no consideration to support it. This is the corner-stone, the foundation, "*the mud-sill,*" upon which the original bill, with all the amendments, rest. And now to ignore this principle is, in effect, to abandon the case.

On no occasion before this, has the nature of the $2,000 00 payment been fully disclosed by the proof. What was the real character of that transaction? Jones bought of Davis, who held at one time the title to all of Collier's property, negroes worth $8,000 00, upon the whole of which the lien of Rawls' judgment attached. The judgment is older than the sale by Collier to Davis. Rawls consents, *gratuitously*, to release to Jones, the purchaser, his lien upon this property, provided $2,000 00 of the purchase-money is paid over to him. What consideration, I ask, was there for this release which was not made to Collier, but to Jones? None can be suggested. And yet this is relied on as an extinguishment of the judgment, a satisfaction of the execution; and the jury are instructed that they may so find. It·is preposterous. Rawls did not so understand it, neither did Collier. Nor would Rawls be bound by it if he did. And it is a perversion of the transaction to attempt to give it such a coloring. If it were so, why did Rawls express his fears to a witness at the time, that he had released his lien upon too much of Collier's property? Why did Collier urge Rawls to take the execution home with him for the purpose of coercing payment out of St. George and Bracewell, his co-defendants? What was it to him what became of the balance, provided he was discharged? Why his subsequent offers to settle the *fi. fa.*, if it was his understanding that he had paid his part of it in full, and was to be looked to no further?

The pretense is, that he was released by this payment of $2,000 00. Why did it never occur to him to say so, instead of showing by his subsequent conduct and declarations, that the very contrary was true?

But the charge to the jury is, that if the contract was proven, Collier was absolved, and that these after admissions were to be explained upon the hypothesis, that they were made in ignorance of his 'rights. But what is there in the

Molyneaux *vs.* Collier.

testimony to justify this supposition? Who knew better than Collier did, the object and intention of that Albany transaction? His after conduct is proof that he, at least, did not so understand that arrangement. Instead of warranting the inference that his subsequent promises were made in ignorance of his rights, his subsequent promises demonstrate that such was not the intent and meaning of that $2,000 00 payment, and that he knew it.

We forbear, ordinarily, to express any opinion upon the evidence, notwithstanding it is made a point in the bill of exceptions, when the case is sent back for a rehearing. But in this case, we feel that justice demands that we should not withhold our opinion upon the facts.

It is manifest that these execution debtors were not insolvent when the original contract was made between Rawls and Collier, which, it is conceded, never was executed. All that is claimed is the substitution of another mode of performance. The joint property of St. George & Collier, at the time, was worth $60,000 00 at law valuation, while their aggregate indebtedness amounted only to $45,000 00. After the payment of every debt which Collier owed, except the balance due upon this Molineux execution, Davis turned over to Collier five negroes, five or six hundred dollars and a settlement of land near Albany. Collier, it is alleged in the argument, is now worth from $100,000 00 to $125,000 00 or upwards. St. George discharged the whole of his liabilities, and left to his widow, his sole heir, $40,000 00, and she being the mother of the Colliers, some $10,000 00 of St. George's estate was cast, at her death, upon her son George W. Collier. These facts are stated, and not denied, whether they appear in the record or not, which was not read, and which I have not the time to read, if I had nothing else to do, between this and the next Term of the Court. They no doubt approximate to accuracy.

If the original agreement was entered into either by the fraudulent concealment of the parties (which I disclaim imputing to them,) or an honest mistake or misapprehension as to the pecuniary condition of the defendants—which is most likely the fact, would not a Court of Equity relieve against such a contract? And it is just or equitable that an honest debt should fail of collection under these circumstances? Does it comport with honor or conscience to let it go unpaid,

when there are so much means that should be applied to its discharge? Can the complainants invoke the aid of Chancery to shield them from its payment?

I have done my duty. I leave it to others to do theirs— as I doubt not they will—as to them may seem right and proper. I shall be content, let the result be as it may.